UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2015 JUL 14  PM 4: 35

CLERK

BY_____
DEPUTY CLERK

STEVEN DIMAGGIO,                           )
                                          )
        Plaintiff,                        )
                                          )
    v.                                    )   Case No. 5:13-cv-296
                                          )
CAROLYN W. COLVIN,                        )
Acting Commissioner of Social Security    )
Administration,                           )
                                          )
        Defendant.                        )

**OPINION AND ORDER ADOPTING MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION**
(Docs. 15, 17, 18 & 22)

This matter came before the court for a *de novo* review of the Magistrate Judge's
December 31, 2014 Report and Recommendation ("R & R") (Doc. 18). The R & R
recommends affirming the decision of Defendant Carolyn W. Colvin, Acting
Commissioner of the Social Security Administration (the "Commissioner") and denying a
motion to remand filed by Plaintiff Steven Dimaggio (Docs. 15 & 17).

Plaintiff seeks a remand or reversal, pursuant to sentences four and six of 42
U.S.C. § 405(g), based on a decision by Administrative Law Judge ("ALJ") Dory Sutker
finding him not disabled. Plaintiff contends that the Commissioner should consider new
evidence on remand and that the Commissioner's decision that he is capable of
performing light work is not supported by substantial evidence. The Commissioner
opposes remand or reversal, arguing that the new evidence would not have altered the
decision to deny Plaintiff benefits. In addition, the Commissioner argues that Plaintiff's
request for reversal of the ALJ's decision should not be considered as the grounds for
reversal was not raised before the Magistrate Judge. If Plaintiff's new arguments are

considered, the Commissioner asserts that the ALJ's decision is supported by substantial evidence.

Plaintiff is represented by Paula J. Kane, Esq. The Commissioner is represented by Special Assistant United States Attorney Luis Pere. The court took this matter under advisement on May 17, 2015.

## I.    Procedural History.

Plaintiff originally applied for Social Security Disability Insurance Benefits ("SSDI") and Supplemental Social Security Income ("SSI") in November 2007. On February 1, 2010, ALJ Sutker held a hearing on Plaintiff's applications and determined that Plaintiff was not disabled. After Plaintiff appealed this decision on October 6, 2011, this court (Reiss, C.J., presiding) remanded to the Commissioner for consideration of Plaintiff's hypersomnolence and the combined effects of hypersomnolence with Plaintiff's other limitations.

On June 5, 2012, ALJ Sutker conducted a second hearing, at which Plaintiff was represented by counsel and testified. Plaintiff's wife also testified, as did a vocational expert. On June 15, 2012, the ALJ issued a second decision in which she concluded that Plaintiff was not disabled.

On November 8, 2013, Plaintiff filed a Complaint in this case, alleging that the ALJ "failed to consider the severity of the plaintiff's pain and the soporific effects of his prescribed narcotic medication[.]" (Doc. 4 at 4, ¶ 14.) He further asserts that the ALJ erroneously concluded that he is capable of performing light work. In the pending motion, however, Plaintiff sought only a remand under sentence six of 42 U.S.C. § 405(g) for consideration of new evidence. Plaintiff seeks to present the reports of Charles Gluck, M.D., Theodore G. Williams, Ph.D., and Roy Shapiro, Ph.D. as additional evidence. Plaintiff also indicates that he "was found disabled at the Disability Determination Services level in a subsequent application filed after the last Appeals

Council decision dated September 9, 2013 became final in the present action." (Doc. 15 at 1.)[1]

On December 31, 2014, the Magistrate Judge issued a R & R, which reviewed the reports of Dr. Williams, Dr. Gluck, and Dr. Shapiro and concluded that they would not have altered the ALJ's decision.  Objections to the R & R were due by January 20, 2015. No objections were filed by that deadline.  On January 28, 2015, the court adopted the R & R and issued a judgment in favor of the Commissioner.  On February 25, 2015, Plaintiff filed objections to the R & R and a motion to set aside judgment.  The Commissioner opposed the motion and Plaintiff's objections, arguing that Plaintiff's objections were not timely and raised new arguments not raised before the Magistrate Judge.

On April 7, 2015, the court granted Plaintiff relief under Fed. R. Civ. P. 60(b).  On April 27, 2015, the court issued an Entry Order requesting additional briefing regarding whether the court should consider arguments that Plaintiff failed to raise before the Magistrate Judge.  Both parties responded with supplemental briefing.

## II.     Whether the Court Should Consider Plaintiff's New Arguments.

In his objections to the R & R, Plaintiff raises arguments that challenge the ALJ's decision on grounds arguably not raised and clearly not addressed by the Magistrate Judge: (1) whether the ALJ followed the treating physician rule; (2) whether the ALJ's conclusion that Plaintiff could perform light work is supported by substantial evidence, and (3) whether the ALJ properly relied on the vocational expert's testimony.  "[T]he Second Circuit has not decided whether a district court must consider a legal argument raised for the first time in an objection to a magistrate judge's report and recommendation." *Wells Fargo Bank N.A. v. Sinnott*, 2010 WL 297830, at *1 (D. Vt. Jan. 19, 2010).  This court has determined that it may exercise its discretion and consider new legal arguments based upon the following factors:

---

[1] Plaintiff later stated that he "was found disabled based on the new report and other prior medical evidence contained in the record in this case." (Doc. 22 at 2.)  He does not explain how this determination relates to the pending case.

> (1) the reason for the litigant's previous failure to raise the new legal argument; (2) whether an intervening case or statute has changed the state of the law; (3) whether the new issue is a pure issue of law for which no additional fact-finding is required; (4) whether the resolution of the new legal issue is not open to serious question; (5) whether efficiency and fairness militate in favor or against consideration of the new argument; and (6) whether manifest injustice will result if the new argument is not considered.

*Id.* at *4; *see also Amadasu v. Ngati*, 2012 WL 3930386, at *6 (E.D.N.Y. Sept. 9, 2012) (applying the same standard).

Although the Commissioner characterizes Plaintiff's failure to raise the new arguments before the Magistrate Judge as a "'purely tactical' decision," (Doc. 30 at 2), Plaintiff argues that paragraph fourteen of his Complaint[2] was sufficient to provide notice that Plaintiff sought to challenge the merits of ALJ Sutker's decision and not just whether new evidence should be presented.  He contends that his motion for a sentence six remand "did not mean that [he] had abandoned his claim that he was disabled anyway, based on the evidence already in the record."  (Doc. 31 at 2.)  Additionally, "Plaintiff['s] attorney had expected an initial separate ruling on the motion for remand." *Id.*  Accordingly, Plaintiff cites some evidence that he intended to present his new arguments

---

[2] Paragraph Fourteen states:

> The administrative law judge failed to consider the severity of the plaintiff's pain and the soporific effects of his prescribed narcotic medication, even though they were supported by the evidence. She again did not give the claimant's primary treating physician's opinion that the claimant could not work controlling weight and instead gave "great weight" to a reviewing physician who had not examined that plaintiff and whose opinion was issued almost four years before the second hearing and which was thus based on incomplete evidence. The ALJ also erred by using the Medical-Vocational Guidelines for light work as a "framework" even though she found that the plaintiff was limited to brief periods of standing, defined as no more than 30 minutes at a time and brief periods of walking of no more than a few minutes at a time and that any sedentary work would need to allow him to extend his feet in a forward position. The light work definition used by the Secretary states that a person must be able to stand or walk for most of a day in order to be included in that definition. The plaintiff's evidence shows that he is entitled to be found disabled within the meaning of 42 U.S.C. sections 423(a) and 1382(a)(3).

(Doc. 4 at 4-5, ¶ 14.)

to the Magistrate Judge, but failed to do so based upon a misunderstanding of how the Magistrate Judge would proceed. This *Sinnott* factor weighs in favor of consideration of Plaintiff's new arguments.

An intervening statute or case has not altered the state of the law, and Plaintiff's arguments do not raise novel issues of law or a new legal issue that is not open to serious question. Plaintiff's new arguments also do not require additional fact findings. Instead, consideration of Plaintiff's new arguments requires analysis only of the administrative record, which the court must review in any event to determine whether a remand is warranted. Efficiency and fairness thus weigh in favor of reviewing Plaintiff's new arguments.

Conversely, a refusal to consider the merits of Plaintiff's new arguments would deprive him of the opportunity to fully challenge the ALJ's decision. The Commissioner has already responded to Plaintiff's new arguments and thus will suffer no prejudice if this court considers Plaintiff's new arguments. This factor also weighs in favor of consideration of Plaintiff's new arguments.

Finally, the court must evaluate if manifest injustice will result from a failure to consider Plaintiff's new arguments. Courts in the Second Circuit "have a strong preference for resolving disputes on the merits[.]" *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 129 (2d Cir. 2011) (internal quotation marks omitted). Although it is not clear that it would be "manifestly unjust" to preclude Plaintiff from raising his new arguments, in light of the minimal prejudice to the Commissioner, and absence of undue delay, "efficiency and fairness militate in favor [of] . . . consideration of the new argument[s.]" *Sinnott*, 2010 WL 297830, at *4. The court therefore exercises its discretion to consider them.

## III.   Factual Background.

Plaintiff is a right-handed, fifty-three year-old male who alleges that he became disabled as of June 1, 2006. He suffers from hallux rigidus, lateral epicondylitis in his left elbow, carpal tunnel syndrome, and obesity. Plaintiff also alleges that he has difficulty with reading, concentration and memory, depression, and hypersomnolence, the

latter of which is a side-effect of his opiate pain medication. He graduated from high school and served in the Army National Guard. He has worked as a carpenter, a construction worker, and a mechanic's assistant.

### A.    Plaintiff's Medical Conditions.

#### 1.    Arthritic Feet.

On November 7, 2006, Plaintiff consulted David Senese, P.A. with complaints of foot pain and fatigue. Plaintiff had been laying tile, kneeling, and wearing steel toed boots. He stated that he did not feel pain when he removed his boots and put on sneakers. Mr. Senese advised Plaintiff to wear shoe inserts and cushioned socks, and to soak his feet after taking off his boots. He recommended that Plaintiff take Ibuprofen. On January 5, 2007, March 16, 2007, and April 5, 2007, Plaintiff again visited Mr. Senese with similar complaints of foot pain. On March 30, 2007, Plaintiff saw Stewart Manchester, M.D., who examined Plaintiff's feet and diagnosed him with "mid tarsal joint arthritis." (AR 239.)

In March 2007, Plaintiff visited a podiatrist, David Groening, D.P.M., for an evaluation of Plaintiff's pain in both feet. Dr. Groening's evaluation revealed bone spurring and degenerative changes, which led to a diagnosis of hallux rigidus.[3] On May 2, 2007, Plaintiff saw Dr. Groening a second time, again complaining of foot pain and stated that "he is unable to stand on his feet for any length of time." (AR 316.) On May 15, 2007, Dr. Groening performed surgery to remove some of the bone spurs on Plaintiff's feet. On May 18, 2007, Plaintiff reported "that he has been doing well" and "only gets some occasional pains in his foot." (AR 339.)

In November 2007, Plaintiff returned to Dr. Groening with complaints of foot pain, described as follows: "[H]e continues to have pain although it is better than it was before the [surgery]." (AR 340.) Dr. Groening diagnosed Plaintiff with arthritis and advised him that he would likely have chronic foot pain. Dr. Groening recommended

---

[3] Hallux rigidus is "restricted mobility of the big toe due to stiffness of the metatarsophalangeal joint especially when due to arthritic changes in the joint[.]" *Hallux rigidus*, MedlinePlus, http://www.merriam-webster.com/medlineplus/hallux%20rigidus (last visited July 11, 2015).

that Plaintiff take anti-inflammatory pain medication and discussed the possibility of joint fusion surgery, but Plaintiff did not wish to pursue that option.

In December 2007 and January 2008, Plaintiff sought treatment for his foot pain from William Roberts, M.D., of the Northwestern Medical Center Pain Clinic. On December 20, 2007, Plaintiff described "[h]is current pain score [as] 5/5 if he walks any distance[.]" (AR 297.) Dr. Williams proposed giving Plaintiff a prescription for Hydrocodone to manage his pain. Dr. Williams discussed job retraining with Plaintiff and observed that Plaintiff desired to return to work as a carpenter, but understood that was unlikely. On December 26, 2007, Dr. Roberts noted that Plaintiff "ambulates without a limp and has no difficulty coming from the waiting room into the exam room." (AR 285.) Nevertheless, Dr. Roberts prescribed Plaintiff Hydrocodone to be taken four times per day and Amitriptyline to be taken once per day.

After an initial trial period of Hydrocodone in December 2007, Dr. Roberts renewed Plaintiff's prescription until December 2008, at which point he stopped prescribing Hydrocodone to increase its efficacy in the future. In February 2009, Dr. Roberts again prescribed Hydrocodone to Plaintiff. At a February 23, 2009 appointment, Plaintiff reported "very little satisfaction" with Hydrocodone and evaluated "his pain at 8.5/10 to 9/10." (AR 496.) Dr. Roberts noted that Plaintiff "continues to be studying welding and doing quite well with that." (AR 497.)

On March 19, 2009, Dr. Groening performed a second surgery on Plaintiff's feet to remove bone spurs. On March 23, 2009, Plaintiff represented to Dr. Groening that "he has not had undue pain." (AR 519.) On April 8, 2009 and again on April 27, 2009, Plaintiff reported that "he has been doing better" and "that he is doing better than before his surgery." (AR 520.) On May 20, 2009, Plaintiff confirmed that "[h]e is not having pain like what he was having before" but "he is applying for disability because he always does have some pain in his feet." (AR 521.) On October 29, 2009, Dr. Groening observed "marked degenerative changes of the [metatarsophalangeal] joint with almost complete obliteration of the joint space[.]" (AR 527.)

7

On February 1, 2010, during an administrative hearing before ALJ Sutker, Plaintiff testified that he was "in constant pain in [his] feet" and experienced "pain spikes" when he was on his feet. (AR 37.) Plaintiff further testified he was unable to do chores around the house and had limited ability to drive motor vehicles. Plaintiff's wife testified he could occasionally load laundry into the washing machine.

On June 5, 2012, after the initial remand, ALJ Sutker held a second administrative hearing. At that hearing, Plaintiff testified that the condition of his feet had gotten worse since the first hearing and that he did not "do anything around the house anymore, and [his] feet are really bothering [him] real bad. Just getting up, walking to the bathroom can be a chore." (AR 622.) Plaintiff further testified that he is no longer able to make himself a simple meal and attempts "to stay off [of his feet]" and to "elevat[e] them[.]" (AR 623.)

### 2.      Lateral Epicondylitis and Carpal Tunnel.

In the spring of 2007, Plaintiff observed a dull ache around his left thumb. On November 15, 2007, Plaintiff visited Dr. Manchester to report numbness in his left hand. Dr. Manchester diagnosed Plaintiff with ulnar neuropathy in his left hand and recommended changes in his diet and exercise. On January 4, 2008, Plaintiff began a course of physical therapy for his left hand with Leanne Blanchard, M.S., P.T., who determined that Plaintiff suffered from tendonitis.

After a three week course of physical therapy, Plaintiff sought medical attention from Steven Landfish, D.O. On February 21, 2008, Dr. Landfish diagnosed Plaintiff with left lateral epicondylitis, commonly referred to as "tennis elbow." Dr. Landfish's examination revealed that Plaintiff had a full range of motion and strength. Dr. Landfish gave Plaintiff an injection of Marcaine and Depo-Medrol and advised him to avoid repetitive motions and heavy lifting for three weeks. Plaintiff reported that the injection did not improve his symptoms, and that he continued to have pain in his thumb and wrist. Dr. Landfish's examination revealed that Plaintiff had a good range of motion in his thumb. He ordered an MRI, which showed "[c]hanges consistent with lateral epicondylitis and tendinous injury." (AR 360.)

8

On March 19, 2008, Andres Roomet, M.D., a neurologist, conducted an electrophysiological evaluation of Plaintiff. Dr. Roomet observed that Plaintiff had "exquisite lateral epicondylar tenderness." (AR 356.) He concluded that Plaintiff has "lateral epicondylitis without significant impairment or abnormality of the left radial nerve[,]" "[m]ild bilateral carpal tunnel syndrome[,]" and "no left ulnar nerve abnormality[.]" (AR 358.)

On April 28, 2008, Plaintiff saw Philip Trabulsy, M.D., of Fletcher Allen Orthopedics and Rehabilitation Services, for a consultation regarding his left hand and elbow. Dr. Trabulsy determined that Plaintiff has "5/5 muscle strength in all muscle groups of both upper extremities[,]" (AR 383), and the "[l]eft elbow range of motion was complete." (AR 384.) "He had tenderness of the left lateral epicondyle to palpation" but "no tenderness over the medial epicondyle of the left elbow." *Id.* Because conservative treatments undertaken thus far had not resolved Plaintiff's complaints, Dr. Trabulsy recommended a surgical consultation.

On June 26, 2008, Plaintiff visited surgeon Michel Benoit, M.D. Dr. Benoit observed that Plaintiff "was in no acute distress[,]" "had full range of motion of his elbow, wrist and hand[,]" and "had exquisite tenderness right over his lateral left epicondyle." (AR 421.) Dr. Benoit advised Plaintiff to have surgery for lateral epicondylitis, but advised against surgery for Plaintiff's carpal tunnel. On July 1, 2008, Dr. Benoit performed surgery consistent with his recommendations. Two weeks later, Dr. Benoit reported that Plaintiff was "doing fairly well" and that the swelling and discomfort Plaintiff was experiencing were expected. (AR 420.) On August 21, 2008, Dr. Benoit found that "the patient is in no apparent distress" and had a "full range of motion about his elbow[.]" (AR 418.) However, Plaintiff "report[ed] having continued left lateral elbow pain." *Id.*

At the February 1, 2010 hearing before ALJ Sutker, Plaintiff testified that he continued to have trouble with his left elbow, even when he did not use it. Plaintiff stated that he did not "really think" that the surgery relieved his symptoms. (AR 413.) At the

9

June 5, 2012 hearing, Plaintiff testified that his left elbow was still sore and hurt him "about the same" amount as it did during the first hearing.  (AR 627.)

### 3.   Obesity.

On March 22, 2007, Plaintiff saw Leslie Gardzina, a registered dietitian, for advice on weight loss.  Ms. Gardzina recorded Plaintiff's height as 74 inches and weight as 264.5 pounds, resulting in a Body Mass Index ("BMI") of 34.[4]

### 4.   Vocational Retraining, Cognitive Limitations, and Hypersomnolence.

In early 2009, Plaintiff attempted to complete vocational retraining courses.  He took a welding course and a typing course.  However, he stated that he had difficulty using a computer and only learned to type through "K" or "L" on the keyboard at a rate of fourteen words per minute.  Plaintiff advised that he completed the computer training course, but noted that the completion requirements were minimal.  He stated that he "was pretty uncomfortable" during the classes and "normally paid for" walking around in class the next day.  (AR 717.)

On October 30, 2008, Dr. Roberts noted that Plaintiff's studies were "going well for him[,]" "he is enjoying his learning experiences[,]" and Dr. Roberts was hopeful that Plaintiff could find employment welding specialty metals.  (AR 500.)  On February 23, 2009, Dr. Roberts indicated that Plaintiff "has had no difficulty with his academics[.]"  (AR 497.)

At the February 1, 2010 hearing, Plaintiff testified that he has limited reading abilities.  Although he enjoyed reading the sports section of the newspaper, he explained that he had trouble with "the big words and stuff."  (AR 715.)  He testified that he is "not very fast [at reading] and . . . not very good at spelling."  *Id.*  At the June 5, 2012 hearing, Plaintiff testified that he read the sports section less frequently.  He would check to see if a particular team won or lost, but would not "sit there and read like the paragraphs[.]"

---

[4] The National Institutes of Health states that obesity occurs at a BMI exceeding 30.0.  *See How Are Overweight and Obesity Diagnosed?*, National Heart, Lung, and Blood Institute, http://www.nhlbi.nih.gov/health/health-topics/topics/obe/diagnosis (last visited July 11, 2015).

(AR 630.)  According to Plaintiff, he had difficulty graduating from high school and participated in special education courses.

Plaintiff also testified that he spends much of the day sleeping because of the side-effects of Hydrocodone.  In the February 1, 2010 hearing, he described his day as getting up, helping his children prepare for school, eating cereal, taking the Hydrocodone, going to sleep for a couple of hours, using the bathroom, sitting in his recliner, and then repeating the process.  At the June 5, 2012 hearing, Plaintiff stated that he slept "[a] good chunk" of the day but had difficulty sleeping through the night.  (AR 626.)  Plaintiff's wife testified that the medication made Plaintiff "very, very tired."  (AR 645.)  She further testified that their children would awaken Plaintiff, but he would fall asleep ten minutes later.

### 5.    Depression.

On May 25, 2010, Plaintiff met with Dr. Manchester to discuss "loss of interest, depressed mood, fatigue, poor concentration, poor sleep, and irritability."  (AR 866.)  Dr. Manchester diagnosed Plaintiff with depression and prescribed Sertraline HCL 50mg.  On August 16, 2010, Dr. Manchester increased Plaintiff's dosage of Sertraline HCL to 100mg.  On April 12, 2011, Dr. Manchester noted Plaintiff had "worsening symptoms of a depressive disorder."  (AR 871.)  On October 19, 2011, Dr. Manchester described Plaintiff's condition as "stable depressed mood[.]"  (AR 874.)

At the June 5, 2012 hearing, Plaintiff explained that he took the Sertraline because he is "real tired of being in this situation" and the medication helped with his depression "[m]ost of the time."  (AR 641.)  Plaintiff's wife described him as "so tired and depressed."  (AR 644.)

### C.    Medical Opinions and Functional Assessments.

In April 2008, Cynthia Short, M.D., a non-examining agency physician, conducted a functional capacity assessment of Plaintiff.  She determined that Plaintiff could occasionally lift up to twenty pounds and frequently lift up to ten pounds.  According to Dr. Short, Plaintiff is capable of standing or walking for up to two hours per day and may sit for up to eight hours per day.  Plaintiff may climb stairs and ladders occasionally,

balance frequently, stoop frequently, kneel frequently, crouch occasionally, and crawl occasionally. Dr. Short placed limitations on Plaintiff's handling abilities, including limiting grasping and twisting with his left arm. Dr. Short found Plaintiff's description of his foot pain and arthritis credible. On October 22, 2008, Geoffrey Knisely, M.D., reviewed the file and affirmed Dr. Short's assessment as written.

On January 29, 2010, Jeffrey Fine, P.A., who worked in Dr. Manchester's office, completed a "social security disability evaluation" of Plaintiff. (AR 859.) Mr. Fine recorded Plaintiff's Mini Mental Status Examination score as thirty out of thirty.[5] He found that Plaintiff had difficulty walking due to his joint pain. When discussing potential psychiatric disorders, Mr. Fine wrote that Plaintiff "is currently asymptomatic[,]" *id.*, and found that Plaintiff's description of his cognitive impairments from the Hydrocodone were consistent with that medication's side effects. He also noted that Plaintiff had not completed any skills retraining, which would limit Plaintiff's employment options.

On the same date, Dr. Manchester assessed Plaintiff's ability to perform work-related activities and produced a written "Addendum to Medical Source Statement of Ability to Do Work-Related Activities[.]" (AR 545.) Dr. Manchester concluded that Plaintiff is not able to perform full time work because he has difficulty with sitting and

---

[5] Thirty out of thirty represents a perfect score on the Mini Mental Status Examination, which is described as follows:

> The [Mini Mental Status Examination] is a 30-point cognitive test used to evaluate an adult's cognitive mental status. It takes ten minutes to administer; results can be used to screen for cognitive impairment, to estimate the severity of cognitive impairment at a given point in time, to follow the course of cognitive changes in an individual over time, and to document an individual's response to treatment. The client's score is adjusted for age and educational status, and places the individual on a scale of cognitive function. . . . Despite its relative limitations compared to some of the more extensive assessment instruments used by medical professionals to diagnose various mental disorders, the [Mini Mental Status Examination] is a useful tool for making a threshold, informal assessment of a client's cognitive functioning on discrete occasions. If the results indicate the client may be, at least at the time of taking the test, cognitively impaired, a more extensive evaluation will likely be necessary.

3 A. Kimberley Dayton, et al., Advising the Elderly Client § 32:17 (2015) (footnotes omitted).

standing for long periods of time and suffers from hypersomnolence. Dr. Manchester opined that Plaintiff is only able to sit for five minutes at a time without changing position and may only sit for a total of four hours. He also indicated that Plaintiff cannot carry any weight, cannot push or pull with his hands, cannot climb, kneel or crouch, cannot be near moving mechanical parts, and cannot operate a motor vehicle.

On May 20, 2012, Dr. Manchester completed a second medical source statement regarding Plaintiff's ability to perform work-related activities, in which he opined that Plaintiff is not capable of working on a full time basis. Dr. Manchester added that Plaintiff experiences "poor focus and concentration[.]" (AR 848.) Dr. Manchester concluded that Plaintiff is not capable of lifting or carrying amounts up to ten pounds; may only sit for five minutes at a time without interruption; cannot walk or stand; is limited to sitting for a total of four hours per day; must have his feet elevated; should not use either of his hands to push or pull and should not use either foot to operate foot controls; cannot climb stairs or ladders; cannot balance, stoop, kneel, crouch, or crawl; cannot tolerate heights, moving mechanical parts, humidity, dust, cold, heat, or vibrations; and, cannot operate a motor vehicle.

### D.     The ALJ's Application of the Five-Step Sequential Evaluation Process.

In the June 15, 2012 decision, ALJ Sutker followed the five-step process[6] and determined that Plaintiff has not engaged in substantial gainful activity since June 1, 2006 and has severe impairments of hallux rigidus, epicondylitis, carpal tunnel syndrome, depression, and obesity. At step three, the ALJ determined that none of Plaintiff's severe

---

[6]     The Social Security Administration regulations outline the five-step, sequential evaluation process used to determine whether a claimant is disabled: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014).

impairments were equivalent to the listed impairments. She found that Plaintiff's depression and cognitive impairments constituted only mild limitations and that he is able to engage in educational classes. At step four, the ALJ evaluated Plaintiff's RFC and determined that he is capable of performing light work, as defined in 20 C.F.R. § 404.1567(b). She imposed limitations that: Plaintiff work in an environment that allows him to stretch his legs; Plaintiff should limit standing to no more than thirty minutes at one time; Plaintiff should have only brief periods of walking; Plaintiff should avoid crawling, climbing, unprotected heights, moving machinery, and driving. She further found Plaintiff may occasionally use forceful grasping, but must avoid twisting with his left upper extremity. She determined that Plaintiff may perform uncomplicated tasks, which can be learned in thirty days or less.

In the final step, the ALJ relied on the testimony of a vocational expert, who answered hypotheticals based on assumptions provided by the ALJ. The vocational expert testified that a person with Plaintiff's abilities and limitations could be: a cashier, with 3.5 million jobs nationally and 22,600 jobs in New Hampshire;[7] a parking lot attendant, with 125,000 jobs nationally and 300 jobs in New Hampshire; a security guard, with 1 million jobs nationally and 2,300 jobs in New Hampshire; a surveillance system monitor, with 999,000 jobs nationally and 340 jobs in New Hampshire; and, a food order clerk, with 276,000 jobs nationally and 280 jobs in New Hampshire. Finding that there are significant numbers of jobs in the national economy that Plaintiff can perform given his RFC, age, education, and work experience, the ALJ determined that Plaintiff was not disabled and not entitled to benefits.

## IV.     Conclusions of Law and Analysis.

### A.     Standard of Review.

A "Magistrate Judge's Report–Recommendation [is] subject to *de novo* review as to those issues upon which the parties raised objections." *Hynes v. Squillace*, 143 F.3d 653, 656 (2d Cir. 1998). The district judge may "accept, reject, or modify, in whole or in

---

[7] Both the ALJ and the vocational expert testified from Manchester, New Hampshire. Plaintiff and his counsel appeared by teleconference from Burlington, Vermont.

part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). A district court is not required to "review . . . a magistrate's factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings." *Thomas v. Arn*, 474 U.S. 140, 150 (1985).

In an appeal from the Commissioner's decision, the court "review[s] . . . the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 447 (2d Cir. 2012) (internal quotation marks omitted).

> Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. But it is still a very deferential standard of review—even more so than the clearly erroneous standard. The substantial evidence standard means once an ALJ finds facts, [the court] can reject those facts only if a reasonable factfinder would have to conclude otherwise.

*Id.* at 447-48 (citations and internal quotation marks omitted).

> Although factual findings by the Commissioner are binding when supported by substantial evidence, [w]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ. Failure to apply the correct legal standards is grounds for reversal.

*Pollard v. Halter*, 377 F.3d 183, 188-89 (2d Cir. 2004) (internal quotation marks omitted).

## B. Plaintiff's New Arguments Challenging the ALJ's Decision.

Plaintiff asserts that he is entitled to a reversal of the Commissioner's decision under sentence four of 42 U.S.C. § 405(g). "Under sentence four, a district court may remand in conjunction with a judgment affirming, modifying, or reversing the Secretary's decision." *Melkonyan v. Sullivan*, 501 U.S. 89, 99-100 (1991) (analyzing 42 U.S.C. § 405(g)).

Plaintiff bears the burden of establishing that he is disabled within the meaning of the Social Security Act. *See* 42 U.S.C. § 423(a)(1)(A); *see also id.* § 423(d)(1)(A)

(defining "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months"). The burden applies to "steps one through four of the sequential five-step framework established in the [Social Security Administration] regulations." *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (internal quotation marks omitted); *see also* 20 C.F.R. §§ 404.1520(a)(4) (listing five steps); 416.920(a)(4) (same). "[W]hile it is true that the Commissioner bears the burden at step five, the ALJ, unlike a judge in a trial, must [her]self affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Butts v. Barnhart*, 388 F.3d 377, 386 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005) (internal quotation marks omitted).

### 1.    Whether the ALJ Followed the Treating Physician Rule.

Plaintiff contends that the ALJ violated the "treating physician rule" by not giving sufficient weight to Dr. Manchester's opinions. The "treating physician rule" requires the ALJ to:

> give more weight to opinions from [a plaintiff's] treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c)(2). The "treating physician rule," however, is not absolute:

> Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician . . . the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts.

*Halloran*, 362 F.3d at 32.

In this case, the ALJ assigned proper weight to Dr. Manchester's opinion and did not violate the "treating physician rule," because there was substantial evidence in the

record that contradicted his opinion.  For example, the ALJ assigned "little weight" to Dr. Manchester's opinion that Plaintiff could not stand or walk for any length of time "because it is not well supported by the evidence of record, particularly Dr. Manchester's own treatment notes." (AR 584.)  Mr. Fine, a P.A. in Dr. Manchester's practice, noted that Plaintiff "is able to tandem walk, walk on his heels, walk on his toes, perform shallow knee bend, without difficulty." (AR 454.)  Dr. Roberts, who treated Plaintiff for his pain, observed that Plaintiff "ambulates without a limp and had no difficulty coming from the waiting room into the exam room." (AR 285.)  Dr. Roberts later indicated that Plaintiff was "able to heel walk and toe walk without difficulty." (AR 500.)  Dr. Groening, the podiatrist who removed some of Plaintiff's bone spurs, noted that Plaintiff "does have discomfort and difficulty standing or walking for prolonged periods of time[,]" but he did not conclude Plaintiff could not stand or walk for any length of time. (AR 334.)  Accordingly, the ALJ properly concluded that substantial evidence contradicted Dr. Manchester's opinion regarding Plaintiff's ability to stand or walk.

The ALJ also assigned "little weight" to Dr. Manchester's opinion that Plaintiff could not lift or carry any weight because Dr. Manchester relied on a single examination of Plaintiff's feet and ankles.  Plaintiff argues that the ALJ failed to consider Dr. Manchester's access to the medical records of other treating physicians.  Those medical records, however, do not indicate that Plaintiff could not lift or carry any weight.  To the contrary, Dr. Landfish, an orthopedist, concluded that Plaintiff had "full range of motion and strength[,]" (AR 351), and Dr. Trabulsy, another orthopedist, observed that Plaintiff had "5/5 muscle strength in all muscle groups of both upper extremities." (AR 383.)  Dr. Roomet, who conducted a neurological exam of Plaintiff's left arm, recorded that "[t]here is no radial distribution weakness.  There is no actual sensory loss atrophy or motor abnormality." (AR 356.)  Moreover, at the February 1, 2010 hearing, Plaintiff testified that he did laundry and that he took a welding course, both of which require some lifting. The ALJ therefore properly accorded little weight to Dr. Manchester's opinion that Plaintiff had no ability to carry or lift weight.

Plaintiff contends that the ALJ further erred by not affording sufficient weight to Plaintiff's mental impairments. The ALJ gave "little weight" to Dr. Manchester's opinion that Plaintiff had moderate restrictions on interacting with others and had poor focus, coping skills, and concentration. (AR 584.) This was consistent with notes of other medical personnel, including Dr. Roberts's observations that Plaintiff "has had no difficulty with his academics[,]" (AR 497), Plaintiff's studies were "going well for him[,]" (AR 500), and Plaintiff "is enjoying his learning experiences[.]" *Id.* Mr. Fine determined that Plaintiff scored a perfect thirty out of thirty on the Mini Mental Status Examination, although he observed that Plaintiff could have cognitive impairments as a side effect of taking Hydrocodone. Accordingly, although Dr. Manchester concluded that Plaintiff's mental impairments would make it difficult for him to perform in a work environment, this observation was not supported by substantial evidence in the record and conflicted with other evidence from Dr. Manchester's office.

Finally, Plaintiff contends the ALJ erred by not properly considering the limitations imposed by Plaintiff's depression and the increase in dosage of his Sertraline prescription between May 2010 and August 2010. However, the ALJ found that Plaintiff was depressed and taking medication for depression. She also noted that Plaintiff's depression justified a determination that Plaintiff could only perform uncomplicated tasks. At the June 5, 2012 hearing, Plaintiff acknowledged that the Sertraline reduced his depression "[m]ost of the time." (AR 641.) Moreover, the lack of evidence that Plaintiff's depression began prior to 2010 supported a conclusion that Plaintiff was not disabled as of June 1, 2006. There is thus substantial evidence to support the ALJ's conclusion that Plaintiff's depression was "no more than a mild limitation." (AR 576.)

## 2. Whether the ALJ Properly Determined Plaintiff's RFC.

Plaintiff makes two challenges to the ALJ's determination of his RFC. First, he argues the ALJ incorrectly determined that he is capable of standing for up to thirty minutes at a time and lifting up to twenty pounds. Second, accepting the limitations imposed by the ALJ, he contends that the ALJ should have determined that he can only perform sedentary work.

The ALJ considered Dr. Groening's opinions, which included a note that Plaintiff had "discomfort and difficulty standing or walking for prolonged periods." (AR 334.) She also accorded some weight to the opinions of Dr. Short and Dr. Knisely that Plaintiff may stand for two hours per day. She observed that the assessments of Dr. Short and Dr. Knisely were supported by the evidence in the record at the time, but that more recent evidence showed that Plaintiff had a greater degree of impairment. Dr. Short and Dr. Knisely proposed limitations that were less restrictive than those found by the ALJ because they found Plaintiff is capable of walking or standing for up to two hours per day, instead of thirty minutes at a time. Considering the opinions of Dr. Short and Dr. Knisely, as well as other opinion evidence in the record regarding Plaintiff's ability to walk and stand, the ALJ properly determined that Plaintiff was capable of standing for no more than thirty minutes at a time. *See Brault*, 683 F.3d at 448 (noting the ALJ is entitled to a deferential standard of review if there is substantial evidence to support a decision).

Plaintiff also challenges the ALJ's conclusion that as of June 15, 2012, he was capable of lifting twenty pounds occasionally and ten pounds frequently in light of the condition of his left arm. The ALJ relied on the medical records that Plaintiff had a full range of motion and strength with his left arm after his surgery. Additionally, although Plaintiff experienced pain after his arm surgery, Dr. Benoit did not prohibit Plaintiff from lifting. The ALJ also properly considered Dr. Short's assessment, and subsequent medical records that revealed that Plaintiff had some ability to lift. Based on this evidence, the ALJ properly found that Plaintiff could occasionally lift twenty pounds and frequently lift ten pounds.

Assuming *arguendo* that the ALJ correctly described his limitations, Plaintiff nonetheless contends that the ALJ improperly found him capable of performing light work with restrictions rather than sedentary work. "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds" and "requires a good deal of walking or standing[.]" 20 C.F.R. § 404.1567(b). In contrast, "[s]edentary work involves lifting no more than 10 pounds at a time" and "a

certain amount of walking and standing is often necessary in carrying out job duties." *Id.*
§ 404.1567(a).

A person may be capable of performing light work, subject to certain restrictions,
even if the person is not capable of performing the full range of light work. *See, e.g.,*
*Queen v. Astrue*, 2012 WL 1016822, at *4 (D. Md. Mar. 23, 2012) ("The fact that the
ALJ found [the claimaint] capable of performing less than a full range of light work in no
way eliminates every occupation listed . . . at the light exertional level."); *Smith v.*
*Chater*, 962 F. Supp. 980, 983 (N.D. Tex. 1997) ("Although [the plaintiff's] limitations
precluded the ALJ from assuming that he could perform the full range of light jobs, they
did not prevent the ALJ from finding that significant light jobs were still available to
him.").

As there was substantial evidence in the record for the ALJ's conclusion that
Plaintiff could stand for up to thirty minutes, walk a few minutes at a time, and lift up to
twenty pounds, the ALJ properly found that Plaintiff could perform a limited range of
light work. The ALJ relied on the testimony of a vocational expert in making this
determination. Where, as here, a claimant's abilities are in between two work categories,
the ALJ may rely on the assistance of a vocational expert to determine whether that
claimant could find work. *See* SSR 83-12, 1983 WL 31253, *3 (Jan. 1, 1983) ("In
situations where the rules would direct different conclusions, and the individual's
exertional limitations are somewhere 'in the middle' in terms of the regulatory criteria for
exertional ranges of work, more difficult judgments are involved as to the sufficiency of
the remaining occupational base to support a conclusion as to disability. Accordingly,
[vocational expert] assistance is advisable for these types of cases."). In this case, in light
of the medical evidence in the record and the vocational expert's testimony, substantial
evidence supported the ALJ's determination that Plaintiff could perform light work. *See*
*Bryson v. Astrue*, 2013 WL 1797642, at *4 (N.D. Cal. Apr. 29, 2013) (affirming the
Commissioner's decision where the ALJ found the "Plaintiff's RFC fell between light
work and sedentary work" because he was capable of meeting the lifting requirements
but not the walking or standing requirements).

Plaintiff further contends that the ALJ erred by not finding him disabled because he was closely approaching advanced age and he had only a high school education, which further limited his ability to perform work.  A person "closely approaching advanced age" is between fifty and fifty-four years old.  20 C.F.R. § 404.1563(d) ("If you are closely approaching advanced age (age 50–54), we will consider that your age along with a severe impairment(s) and limited work experience may seriously affect your ability to adjust to other work.").  The Commissioner "will not apply the age categories mechanically in a borderline situation" and may consider a person in an older category if they are within a few months of reaching that category.  *Id.* § 404.1563(b).

According to Table 1, 20 C.F.R. § 404, Appendix 2, a person who is only capable of performing sedentary work, is closely approaching advanced age, has a high school education that "does not provide for direct entry into skilled work[,]" and has only performed unskilled or non-transferrable skilled work is disabled.  Under Table 2, the same person who is capable of performing light work is not disabled.

Plaintiff was forty-five years old when he originally applied for disability benefits, forty-eight years old during the first hearing, and fifty years old during the second hearing.  As the ALJ properly determined that Plaintiff was capable of performing light work, even if Plaintiff was treated as closely approaching advanced age at the time of the second hearing, this alone, would be insufficient to support a conclusion that he was disabled in light of substantial countervailing evidence in the record.

### 3.    Evidence that There Are a Significant Number of Jobs that Plaintiff Can Perform.

Plaintiff also challenges the ALJ's use of the vocational expert's testimony in her determination that there are a significant number of jobs that he can perform.  He argues that the ALJ used improper hypotheticals and he is not capable of performing the jobs identified by the ALJ.

"At Step Five, the Commissioner must determine that significant numbers of jobs exist in the national economy that the claimant can perform."  *McIntyre*, 758 F.3d at 151.  To make this determination, the ALJ may rely on "a vocational expert's testimony

21

regarding a hypothetical as long as there is substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion and accurately reflect the limitations and capabilities of the claimant involved[.]" *Id.* (citation and internal quotation marks omitted).

Here, the ALJ asked a vocational expert several hypotheticals to determine if there were jobs available that Plaintiff could perform in the national economy. The ALJ asked the vocational expert to assume, among other things, that an individual is able to stand for thirty minutes at a time, walk for a few minutes at a time, lift twenty pounds occasionally and ten pounds frequently, and had restrictions on driving and using his left hand. The vocational expert testified that a person with those limitations would not be able to perform Plaintiff's prior employment positions. However, he opined that the individual could be a cashier, with 3.5 million jobs nationally and 22,600 jobs locally; a security guard, with 1 million jobs nationally and 230 jobs locally; a surveillance system monitor, with 990,000 jobs nationally and 340 jobs locally; a food order clerk, with 276,000 jobs nationally and 280 jobs locally; or, a parking lot attendant, with 125,000 jobs nationally and 300 jobs locally. He further opined that there would be no jobs for this individual if he had cognitive limitations that made him twenty percent less productive than the norm.

Plaintiff challenges the assumptions of the hypotheticals because he contends that he is unable to stand for up to thirty minutes at a time and that he has poor coping and concentration skills. Similarly, he argues that the ALJ failed to accept the vocational expert's testimony related to his depression and his ability to focus, concentrate, and remember instructions. Because substantial evidence in the record supported the ALJ's conclusion that Plaintiff has the ability to stand for thirty minutes and that his cognitive impairment did not prevent him from working, the hypotheticals were properly framed and relied on by the ALJ to conclude that there were a significant number of jobs that Plaintiff could perform.

Plaintiff nonetheless asserts that he is unable to perform the jobs described by the vocational expert as he cannot work as a security guard because he is not capable of walking and standing as the job requires. The vocational expert testified that there are

230 jobs locally as a security guard that do not involve walking or standing beyond the thirty minutes in the hypothetical.[8]  Plaintiff contends that he could not be a parking lot attendant because he is unable to drive or service vehicles.  The hypothetical assumed these limitations and the vocational expert testified that he was "thinking more of the person that's in the booth that just collects money." (AR 651.)  Plaintiff argues that he cannot be a cashier because the vocational expert did not specify that the available positions would be seated, but the vocational expert classified this position as sedentary and described it as a position that a person with Plaintiff's limitations could perform.  Plaintiff asserts that he cannot perform any of these jobs because of his cognitive impairments.  Substantial evidence in the record, however, contravenes Plaintiff's argument that he has cognitive impairments that would prevent him from working.

As the ALJ properly relied on the testimony by the vocational expert to establish the number of jobs in the national and local economy that Plaintiff could perform, the only remaining issue is whether these numbers are significant.  *See* 42 U.S.C. § 423(d)(2)(A).  The vocational expert identified five types of jobs, each with hundreds of thousands of positions nationally and hundreds or thousands of jobs in the local economy that could be performed with Plaintiff's limitations.  Courts have held that this number is sufficient.  *See, e.g., Bull v. Comm'r of Soc. Sec.*, 2009 WL 799966, at *6 (N.D.N.Y. Mar. 25, 2009) (noting that "the vocational expert's testimony stating that there were approximately 100,000 jobs of this nature in the national economy and 125 locally constitutes a significant number"); *see also Gurule v. Astrue*, 2012 WL 1609691, at *4 (D. Vt. May 8, 2012) (collecting cases).  Because the Commissioner sustained her burden of establishing that there are a significant number of jobs available in the national and local economy that Plaintiff could perform, she satisfied her burden at step five.[9]

---

[8] The ALJ's decision states there are 2,300 local jobs as a security guard.  The vocational expert testified that there are 2,300 local jobs as a security guard, but only ten percent of those can be performed with Plaintiff's limitations.

[9] Plaintiff also argues that the ALJ erroneously indicated that his date of last insured was December 31, 2010 instead of December 31, 2011.  Although the ALJ made this error in the June

## V.    Plaintiff's New Evidence.

### A.    Plaintiff's New Evidence: Evaluations Conducted after the June 5, 2012 Hearing.

On December 28, 2013, Dr. Gluck conducted a physical evaluation of Plaintiff. At the time, Plaintiff was 73 inches tall and weighed 279 pounds. Dr. Gluck noted that Plaintiff "seems depressed and somewhat moribund with poor memory." (Doc. 16-1 at 2.) The examination revealed that Plaintiff had "degenerative changes of his second metatarsal phalangeal joints and mid-foot" and complained of considerable pain. *Id.* However, Plaintiff's tandem walking, bending, and squatting were normal. Dr. Gluck scored Plaintiff's left hand strength at three out of five, his right hand grip as normal, and his motor control of his fingers and hands as normal. Plaintiff performed normally on carpal tunnel tests as well as thumb movement tests.

As proposed limitations, Dr. Gluck recommended that Plaintiff limit himself to four hours of standing per day with walking limited to a few minutes at a time. Dr. Gluck indicated that Plaintiff can lift fifty pounds occasionally and twenty-five pounds frequently with his right arm, and he can lift twenty pounds occasionally and ten pounds frequently with his left arm. Dr. Gluck did not place limitations on Plaintiff's postural activities, manipulative activities, or "[w]orkplace environmental activities[.]" *Id.* at 6.

On December 24, 2013, Dr. Williams, a clinical and forensic psychologist, conducted a psychological evaluation of Plaintiff. Dr. Williams described Plaintiff's

---

15, 2012 decision, she also stated at the June 5, 2012 hearing that Plaintiff's date of last insured was December 31, 2011. *See* AR 616 ("I am showing . . . your date of last insured [as] December 31, 2011[.]"). She referred to Plaintiff's date of last insured as December 31, 2010 in the February 1, 2010 hearing and Plaintiff's counsel did not correct her when asked. The record indicates December 31, 2011 as Plaintiff's date of last insured. *See* AR 154 ("DIS DLI: 12/11"); AR 811 ("DLI 12/11"). Any error regarding Plaintiff's date of last insured was thus inadvertent and harmless as it does not impact the ALJ's ultimate conclusion. *See Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) ("[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination.") (internal quotation marks omitted); *Hendricks v. Barnhart*, 154 F. App'x 529, 531 (7th Cir. 2005) (finding "the doctrine of harmless error spares us from remanding this case for what would at most be an inconsequential error" for an assessment of the date of last insured where "[t]he ALJ . . . properly found [the plaintiff] not disabled").

"behaviors and mannerisms" as "consistent with what would be expected from age related peers who are depressed." (Doc. 16 at 3.) According to Dr. Williams, Plaintiff "was not easily distracted and . . . he did not present with obvious impulsive personality traits. Having said this, [Plaintiff] did report that he tends to be impulsive in his behaviors and decision making." *Id.* at 4. He described Plaintiff's "thoughts [as] rationally based and reasonably well organized. He did not present with any tangential or circumstantial thought processes." *Id.*

Dr. Williams described Plaintiff's intellectual abilities as "low average" and his "immediate, midrange and long-term memory abilities were intact." *Id.* Dr. Williams concluded that Plaintiff suffers from "major depressive disorder as well as alcohol dependence." *Id.* at 5. He further found that Plaintiff "presents with the necessary intellectual and mathematical abilities as coping skills to manage his financial affairs responsibly at the current time." *Id.* at 6. Dr. Williams did not evaluate whether Plaintiff's physical complaints would impair his ability to work, but instead recommended that a medical doctor conduct such an evaluation.

Finally, on January 2, 2014, Dr. Shapiro, conducted a psychological and functional assessment of Plaintiff. Dr. Shapiro found that Plaintiff "makes [a] credible case for ongoing depressive symptoms limiting social skills, and likely sustainability as well." (Doc. 16-2 at 10.) Additionally, "[l]ongitudinal review suggests intact cognitive skills in the low average range [and] he likely has reading and math limitations." *Id.* Dr. Shapiro opined that Plaintiff could lift twenty pounds occasionally and ten pounds frequently, stand or walk for up to three hours per day, and sit for about six hours per day. Dr. Shapiro advised that Plaintiff can also occasionally climb stairs and ladders, occasionally kneel, occasionally crawl, and has no restrictions on balancing and stooping. Dr. Shapiro placed restrictions on Plaintiff's use of his left hand.

Dr. Shapiro found that Plaintiff's ability to remember locations and work procedures as well as understand simple instructions was not significantly limited, although Plaintiff had limited ability to remember detailed instructions, could only complete one to three step tasks, and had difficulty concentrating. Dr. Shapiro further

25

opined that Plaintiff could be distracted by the presence of others and may not respond
appropriately to instruction or criticism from supervisors. Dr. Shapiro concluded that
Plaintiff "retains the adaptive skills to deal with routine changes and safety concerns."
*Id.* at 16. Dr. Shapiro recommended that Plaintiff be limited to sedentary work.

**B.      Whether Plaintiff is Entitled to a Remand for Consideration of
          New Evidence.**

Plaintiff seeks a remand under sentence six of 42 U.S.C. § 405(g) for
consideration of new evidence. "The court may . . . any time order additional
evidence . . ., but only upon a showing that there is new evidence which is material and
that there is good cause for the failure to incorporate such evidence into the record in a
prior proceeding[.]" 42 U.S.C. § 405(g). "[A]n appellant must show that the proffered
evidence is (1) new and not merely cumulative of what is already in the record and that it
is (2) material, that is, both relevant to the claimant's condition during the time period for
which benefits were denied and probative[.]" *Lisa v. Sec'y of Dep't of Health & Human
Servs. of U.S.*, 940 F.2d 40, 43 (2d Cir. 1991) (citation and internal quotation marks
omitted). "Good cause for failing to present evidence in a prior proceeding exists
where . . . the evidence surfaces after the Secretary's final decision and the claimant
could not have obtained the evidence during the pendency of that proceeding." *Id.* at 44.
(internal quotation marks omitted).

Plaintiff's proposed new evidence consists of medical evaluations by Dr.
Williams, Dr. Gluck, and Dr. Shapiro. As the Magistrate Judge observed, both Dr. Gluck
and Dr. Williams performed their evaluations of Plaintiff in December 2013, eighteen
months after ALJ Sutker issued her most recent decision. Dr. Gluck's evaluation is less
favorable to Plaintiff than the ALJ's determination because his restrictions on Plaintiff's
ability to perform work are more limited. For example, Dr. Gluck determined Plaintiff
may stand for up to four hours per day, walk for three to four minutes at a time, and
occasionally carry up to fifty pounds. He also would place no limitations on Plaintiff's
sitting, posture, and "[m]anipulative activities[.]" (Doc. 16-1 at 6.) Dr. Gluck's report
did not state that Plaintiff's condition in December 2013 could be related back to

Plaintiff's condition on June 1, 2006, the date that Plaintiff alleges he became disabled. In contrast, the ALJ limited Plaintiff to standing for "no more than 30 minutes at one time" and noted that he should "avoid twisting with his left upper extremity." (AR 577.)

Similarly, Dr. Williams's report does not support Plaintiff's argument that he is incapable of performing light work. Dr. Williams determined that Plaintiff "did not present as someone who is easily confused or who experiences problems with comprehension" and he "was not easily distracted[.]" (Doc. 16 at 4.) Dr. Williams's assessment differed from Mr. Fine's assessment, on which the ALJ relied, in that he scored Plaintiff with a twenty-five out of thirty on the Mini Mental Status Examination, rather than thirty out of thirty. However, Dr. Williams declined to evaluate whether Plaintiff's conditions would impact his ability to work and did not relate back his assessment to June 1, 2006.

Finally, Dr. Shapiro's January 2014 evaluation of Plaintiff is arguably consistent with the ALJ's determination. Although Dr. Shapiro restricted Plaintiff to sedentary work, he noted that Plaintiff could stand or walk for up to three hours per day and sit for up to six hours per day. Dr. Shapiro did not place limitations on Plaintiff's ability to push or pull and operate hand and foot controls. He concluded that Plaintiff could occasionally climb ladders and scaffolds. Dr. Shapiro limited Plaintiff's ability to remember instructions and perform multi-step tasks, which is consistent with the ALJ's determination that Plaintiff can only perform uncomplicated tasks. Dr. Shapiro's evaluation was limited in time from September 30, 2013 to the present and did not relate back to the date of disability.

As the Magistrate Judge pointed out, because Plaintiff's new evidence does not address Plaintiff's condition on June 1, 2006, it does not provide a substantial ground for concluding that the ALJ's findings of fact and conclusions of law require reevaluation. The court ADOPTS the R & R as its own Order for purposes of the sentence six remand, finding it well-reasoned.

## CONCLUSION

For the foregoing reasons, the court hereby ADOPTS the Magistrate Judge's R & R as the court's Opinion and Order, DENIES Plaintiff's motion to remand (Doc. 15), and GRANTS the Commissioner's motion for an order affirming the decision of the Commissioner (Doc. 17). The court DENIES Plaintiff's motion for a reversal based on his new arguments (Doc. 22).

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 14th day of July, 2015.

Christina Reiss, Chief Judge
United States District Court